UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| LULU, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 09-CV-37-B-W |
| | ) | |
| CHESAPEAKE BOATS, INC., | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION and
ALTERNATIVE REQUEST FOR TRANSFER OF VENUE**

Lulu, Inc., a Maine corporation with operations in Bar Harbor, contracted with Maryland-based Chesapeake Boats, Inc., for construction of a vessel at Chesapeake's Maryland facility. Chesapeake built the vessel in Maryland and delivered it to Lulu in Maryland. Lulu filed suit in the District of Maine alleging that Chesapeake breached the contract and warranty associated with the vessel, made certain promises that must be fulfilled, and made certain misrepresentations about the vessel's condition and fitness that must be remedied. Chesapeake filed a motion to dismiss for want of personal jurisdiction. Should that motion be denied, Chesapeake requests that the case be transferred to the District of Maryland for further proceedings. The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For reasons that follow, I recommend that the Court deny the motions.

## FACTS

When a motion to dismiss for lack of personal jurisdiction is filed pursuant to Federal Rule of Civil Procedure 12(b)(2), it is the non-movant who bears the burden of establishing that personal jurisdiction is proper. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). That burden is to develop a record that, "if credited, is enough to support findings of all facts essential to personal jurisdiction." Snell v. Bob Fisher Enter., Inc., 115 F. Supp. 2d 17, 20 (D. Me. 2000) (quoting Boit v. Gar-Tec Prod., 967 F.2d 671, 675 (1st Cir. 1992)). Both parties may participate in the development of the jurisdictional record. However, the non-movant plaintiff's properly supported proffers of evidence are accepted as true and all evidentiary disputes are resolved in the plaintiff's favor. Id.

Plaintiff Lulu, Inc., conducts a seasonal business in Bar Harbor involving passenger carriage by watercraft. (Compl. ¶ 5.) In the winter of 2006/2007, Lulu, through its president and sole stockholder, John Nicolai, contacted Defendant Chesapeake Boats, Inc., because it sought to obtain a new commercial vessel for its business. (Nicolai Aff. ¶ 1, 3, Doc.[1] 8-2.)

Chesapeake is not licensed to do business in Maine and has no agents, employees, or registered agent in Maine. (Mason Aff. ¶¶ 19-20, Doc. 6-2.) Chesapeake has no offices, real property, records, bank accounts, phone numbers or mailing addresses in Maine. (Id. ¶ 21.) Chesapeake does not directly advertise in Maine through any Maine advertising agency. (Id. ¶ 22.)

---

[1] Electronic docket item.

Nicolai first learned of Chesapeake from advertisements Chesapeake placed in *National Fisherman* and/or *Boats and Harbors*, publications sold in Maine. (Nicolai Aff. ¶ 3.) He also visited Chesapeake's website, which asserted that "there are Chesapeake Boats in Maryland, Virginia, New Jersey, New York, Ohio and Oregon. Call us today so we can add your state to that list." (Id., Exhibit A, Chesapeake Boats Archived Website Pages, Doc. 8-3.) Nicolai subsequently called Chesapeake and spoke with its president, David Mason. Nicolai related what he wanted and explained that his business operated out of Bar Harbor, Maine. (Nicolai Aff. ¶ 4.) Chesapeake faxed Lulu a list of references and also emailed Nicolai to determine his interest. (Id. ¶¶ 5, 7 & Exhibit B, March 15, 2007, E-mail, Doc. 8-4.) Some references told Nicolai that Chesapeake had sent workers to their locations, outside of Maryland, to perform warranty work. (Nicolai Aff. ¶ 6.) Nicolai assumed that he would receive equivalent services if he should ever require warranty work on a Chesapeake boat.[2] (Id.) Nicolai and Mason participated in many phone calls between their respective Maine and Maryland locations to discuss the kind of boat Lulu wanted to have constructed and how soon it could be completed. (Id. ¶ 8.) Mason promised that Chesapeake would build the vessel to Lulu's specifications and that it would come with a lifetime warranty. (Id.) Nicolai traveled to Chesapeake's Crisfield, Maryland location in March 2007 to develop his requirements and on March 20, 2007, Chesapeake faxed written confirmation of the agreement to Nicolai's attention, specifying a contract price of $183,269.00. (Id. ¶ 10 & Exhibit C, March 20, 2007, Facsimile, Doc.

---

[2] Chesapeake maintains that Lulu's most recent correspondence has demanded that the vessel be transported to Maryland for repairs. (Mason Aff. ¶ 33.) The affidavit references an exhibit F, which is not included among the attachments. There is an exhibit D that includes such a demand. (Id. Ex. D, Lulu Letter of April 30, 2008, Doc. 6-6.) The warranty is advertised to include a "lifetime warranty against manufacturing defects," which is transferable, and which "covers ALL materials, transportation and labor." (Nicolai Aff. Ex. A, Chesapeake Boats Archived Website Pages at 2, Doc. 8-3.)

8-5; Mason Aff. ¶ 5, Doc. 6-2.)  Lulu responded with a $10,000 deposit check, sent by mail.  (Mason Aff. ¶ 7 & Exhibit B, Lulu Letter of March 22, 2007, Doc. 6-4.) Numerous additional communications were exchanged over the wires during the course of construction, including communication about delayed construction and a changed engine specification.  (Nicolai Aff. ¶¶ 12-16, 19.)  Chesapeake constructed the vessel at its Maryland facility.  (Mason Aff. ¶ 9.)

In September 2007, Chesapeake submitted drawings and specifications to the United States Coast Guard, identifying Bar Harbor, Maine, as the vessel's home port. The Coast Guard Inspector approved the vessel for carrying passengers.  (Id. ¶ 12; Nicolai Aff. ¶ 17 & Exhibit D, Drawings and Specifications, stamped by US Coast Guard, Marine Inspection, Baltimore, Md., Doc. 8-6.)  The final invoice for construction and the final payment were exchanged in October 2007.  (Nicolai Aff. ¶ 18.)  Chesapeake notified Lulu that the vessel was ready for delivery in November 2007, months later than the promised July date.  (Id. ¶¶ 8, 20.)  Lulu accepted delivery in Maryland and directed a third-party trucking company to haul the vessel from Maryland to Maine.  (Mason Aff. ¶ 13.)

Nicolai was not satisfied with various aspects of the vessel and contacted Mason concerning what he regarded as warranty issues.  (Nicolai Aff. ¶ 21.)  Mason disputed the claims, but requested photographs depicting the issues.  (Id. ¶¶ 22-23.)  In April 2008, according to Nicolai, Mason indicated during a phone conversation that Chesapeake would perform certain warranty work and reimburse Lulu for certain repairs.  (Id. ¶ 24.) Chesapeake then sent correspondence to Lulu through counsel, stating that it would address three problems, but still rejecting other warranty contentions.  (Id. ¶ 25.)  Lulu

4

maintains that there are significant and numerous defects in the vessel, including safety hazards, and that it incurred significant expenses for services rendered by a marine surveyor and three Maine-based service outfits.  (Id. ¶¶ 26-27 & Exhibit F, Coastal Marine Survey Inspection Report, Doc. 8-8.)  Lulu plans to call related individuals as witnesses to support its repair and defect claims.  (Id. ¶28.)

Chesapeake's insurer retained a marine surveyor who inspected the vessel in Maine in December 2008.  (Id. ¶ 30.)

Both parties wish to avoid the disruption that out-of-state litigation would impose on their business operations;  Lulu because Nicolai is the captain of the vessel and must be available to give tours during its operating season, and Chesapeake because it has only six employees, not including Mason, all of whom live in Maryland and are essential to its operations and to keeping its construction schedule on track.  (Id. ¶ 31;  Mason Aff. ¶¶ 27-31.)  Mason also reports a prior heart attack that has limited his travel, as well as a fear of flying.[3]  (Mason Aff. ¶ 32.)

Since constructing Lulu's vessel based on Lulu's specifications and drawings, Chesapeake has begun to advertise a Down East style lobster boat hull as an available product and it has updated its list of states with "satisfied customers" to include the State of Maine.  (Nicolai Aff. ¶ 32 & Exhibit G, Chesapeake Bay Web Pages, Doc. 8-9.)  Chesapeake has retained the drawings of Lulu's vessel.  (Id. ¶ 33.)

---

[3]   Lulu has evidence that Mason traveled from Maryland to Florida in 2009.  (Dunne Aff. ¶ 2, Doc. 8-10.)  Chesapeake explains that Mason broke up his vacation travel to Florida into several days of limited car travel.  (Supplemental Mason Aff. ¶ 7.)

There is another action pending against Chesapeake in the Superior Court of New Jersey which is beyond the discovery stage. (Dunne Aff. ¶ 4, Doc. 8-10 & Exhibit A, *Rosenburgh v. Chesapeake Boats, Inc.*, Complaint, Doc. 8-11.)

### DISCUSSION

There are two motions pending. Chesapeake has filed a motion to dismiss based on an alleged lack of jurisdiction (Doc. 6) and, in the alternative, Chesapeake requests that the Court transfer the case to the District of Maryland on venue grounds (Doc. 7).

**A.      Personal Jurisdiction**

When this Court's subject matter jurisdiction is based upon the diversity of the parties' citizenship, as it is here, the federal court's exercise of jurisdiction over an out-of-state defendant is limited not only by the Fourteenth Amendment's Due Process Clause, but also by any limitations that state law imposes on the exercise of jurisdiction by a state court. Me. Helicopters, Inc. v. Lance Aviation, Inc., 563 F. Supp. 2d 292, 294-95 (D. Me. 2008). Although Maine's long-arm statute does not restrict the jurisdictional reach of Maine courts, except insofar as the United States Constitution imposes limits on the same, 14 M.R.S. § 704-A, the Maine Law Court has formulated a multi-factor test that differs, slightly, from the multi-factor test prescribed by the First Circuit Court of Appeals. With respect to this test, the Law Court has produced opinions on close jurisdictional questions that must guide this Court's exercise of diversity jurisdiction, lest a plaintiff "obtain wider personal jurisdiction in a diversity case, merely by bringing its case in federal court." Id. at 295 (collecting Law Court precedent). The Law Court's formulation of the legal standard requires that the plaintiff must demonstrate: (1) that Maine has a legitimate interest in the subject matter of the litigation and (2) that the

defendant reasonably could have anticipated litigation in Maine based on the nature of its conduct.  If this showing is made, then the burden shifts to the defendant to demonstrate: (3) that the exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice.  Connelly v. Doucette, 2006 ME 124, ¶ 7, 909 A.2d 221, 223.

This formulation largely overlaps with the jurisdictional test prescribed by the First Circuit.  In cases like this one, where the out-of-state defendant does not maintain continuous and systematic contacts with Maine, the plaintiff must demonstrate (1) that its claims arise from, or are related to, the defendant's forum contacts;  (2) that those contacts reflect the defendant's "purposeful availment" of the benefits and protections afforded by Maine law;  and (3) that the exercise of jurisdiction will not be inconsistent with traditional notions of fair play and substantial justice, as measured by a collection of gestalt factors:

> the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies.

N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005).

In effect, the Law Court's second inquiry encompasses the First Circuit's first and second.  See Connelly, 2006 ME 124, ¶ 9, 909 A.2d at 224.  Otherwise, the Law Court has prioritized the issue of Maine's interest in the litigation, which the federal formulation relegates among the gestalt factors.  Northern Laminate Sales, 403 F.3d at 26.

The motion to dismiss presents a close question and is exceedingly well briefed by both sides.  After considering the various factors, I conclude that a Maine court would

7

exercise jurisdiction over this case and that such an exercise would comport with due process.

### 1. *Maine's Interest in the Litigation*

Chesapeake argues that Maine does not have any interest in this litigation because all of the alleged deficiencies in the vessel were present when Lulu purchased and accepted the vessel in Maryland. Chesapeake says that, consequently, Lulu is relying entirely on its Maine citizenship to support jurisdiction. (Mot. to Dismiss at 7, Doc. 6.) In Chesapeake's view, "Maine does not have an interest in the Maryland contract or [Lulu's] complaints regarding the performance of that contract in Maryland. (Id. at 8.) Lulu's response is that Maine has a heightened interest in resolving this dispute because the marine surveyor's report raises safety concerns (Opposition Mem. at 11-12, Doc. 8), and "where damages are incurred in Maine, and witnesses and/or documents relating to such damages are located here, the 'legitimate interest' requirement is fulfilled" (id. at 12). Maine law so holds. Connelly, 2006 ME 124, ¶ 8, 909 A.2d at 223-24.

### 2. *Anticipation, Forum-Claim Relation, and Purposeful Availment*

At the core of the jurisdictional contest are a collection of phrases that parse the various relationships between the defendant and the forum. Most basically, it is necessary that the defendant have engaged in conduct that connects it to the forum state in a meaningful way, such as by conduct voluntarily directed at a particular plaintiff who resides in the forum. N. Laminate Sales, 403 F.3d at 25. If the defendant's conduct is not directed toward the forum, or someone in it, but nevertheless has a foreseeable impact within the forum, jurisdiction generally will not exist. As the Law Court explains it: "the commission outside the forum state of an act that has consequences in the forum state is

8

*by itself* an insufficient contact where all the events necessary to give rise to a tort claim occurred outside the forum state." Martin v. Deschenes, 468 A.2d 618, 619 (Me. 1983) (emphasis added).  Similarly, the Supreme Court has cautioned that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980).  As stated by the United States Supreme Court:

> If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey; or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there.  Every seller of chattels would in effect appoint the chattel his agent for service of process.  His amenability to suit would travel with the chattel.

Id. at 296 (rejecting exercise of jurisdiction by Oklahoma court over a New York car dealership that did not market itself to, or otherwise endeavor to serve, the Oklahoma market, but merely sold a vehicle to New York residents who drove to Oklahoma and were involved in an automobile accident there).  Though such a movement of product is foreseeable, this kind of hook has been squarely rejected for jurisdictional purposes.  Id. at 295-96.  Here, of course, mere foreseeability, as in "fortuity," is not all that exists because Chesapeake voluntarily contracted with a Maine resident knowing that the boat it would construct and sell was bound for use in Maine.  Chesapeake also advertised its boat-building services in a multi-state fashion, hoping to serve not only its local market, but also the regional market, including Maine.  Finally, Chesapeake extended a lifetime warranty over the boat.  These facts change the picture appreciably from what was at stake in World-Wide Volkswagen.  As the Supreme Court noted in that case, in

9

contradistinction to the facts before it: "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." Id. at 297-98. Delivery of a product into the stream of commerce, actually anticipating sales (not merely foreseeing the possibility of sales) in the forum state, changes the result.

Of course, Chesapeake did not, technically, place Lulu's boat "into the stream" in order for it to arrive in Maine. Chesapeake knew at all times that its product was destined for Lulu in Maine. This suggests a stronger forum contact than the typical stream of commerce case. On the other hand, Chesapeake also structured its commercial conduct so that construction, purchase, and delivery all transpired in Maryland. Chesapeake delivered its product into the hands of the customer in Chesapeake's home state. World-Wide Volkswagen has something to say about this as well in that it recognizes the need for potential defendants to be able "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." Id. at 297. By structuring the transaction in the way it did, Chesapeake did ensure that the product would ultimately come to Maine by the unilateral action of another party. It is a common refrain that the unilateral activity of a third party, other than the defendant's own agent, cannot be attributed to the defendant for purposes of establishing forum contacts. Hanson v. Denckla, 357 U.S. 235, 253 (1958). In Hanson, the Supreme Court explained that: "The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the

10

forum State, thus invoking the benefits and protections of its laws." Id. (citing International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). Did Chesapeake avoid purposeful availment of the privilege of doing business in Maine by structuring the transaction as it did, despite its regional marketing efforts, its interstate sales communications, and its provision of a lifetime warranty in a product it knew to be destined for use in Maine? Chesapeake believes it did exactly that.

Lulu resists such a conclusion, citing Maine Helicopters. In Maine Helicopters, Judge Hornby concluded that this Court had personal jurisdiction over a Florida enterprise that sold a helicopter to a Maine enterprise, even though the sale was consummated in Florida. The case was decidedly a close one. 563 F. Supp. 2d at 298. A material factor in that case was the fact that the seller, post-sale, allegedly sent communications "into Maine to prevent discovery of the helicopter's true condition, and refuse[d] to correct alleged problems with the helicopter that could affect the safety of those using the aircraft, as well as its value and cost of repair." Id. at 296. With respect to Maine's "anticipation of litigation" formulation, Judge Hornby had to determine whether the teachings of Bickford v. Onslow Memorial Hospital Foundation, 2004 ME 111, 855 A.2d 1150 (finding jurisdiction), or Murphy v. Keenan, 667 A.2d 591 (Me. 1995) (rejecting jurisdiction), controlled the outcome. Based on the pre- and post-sale conduct of the defendant in Maine Helicopters, he concluded that a Maine court could exercise jurisdiction over the Florida defendant without offending Law Court precedent, alluding to similarities with Bickford and highlighting distinctions with Murphy.

In Bickford, the plaintiff sued an out-of-state hospital that notified credit reporting agencies that the plaintiff was placed in collection for failure to pay for the hospital's

11

services.  The services in question involved medical care for the plaintiff's daughter, who lived with her mother (plaintiff's ex-wife) in North Carolina, but the plaintiff had never agreed to pay for the services.  2004 ME 111, ¶¶ 2-3, 855 A.2d at 1153.  The plaintiff sued for libel, among other theories, based on the hospital's failure to correct the notice that was damaging his credit.  Id. ¶¶ 3-4.  The Law Court concluded that personal jurisdiction existed over the North Carolina hospital, despite the absence of any concrete contacts to Maine, because the plaintiff had placed the hospital on notice that its conduct was improper and that it was harming a Maine resident, yet the hospital refused to correct its false report.  In the Law Court's view:

> Because the hospital was thereafter on notice that it was injuring a Maine resident by failing to take steps to eliminate the use of the allegedly libelous statement, it could reasonably have anticipated being required to respond to litigation in Maine courts.  The hospital's conduct affected a Maine resident, and after Bickford contested the report, the hospital can be understood to have "intentionally directed" its conduct toward a Maine resident.

Id., ¶ 13, 855 A.2d at 1156.  The jurisdictional hook in Bickford, in other words, was the fact that the hospital was put on notice that its failure to correct its credit notification was causing a continuing harm in Maine.  Bickford, of course, was not a product case.  The point of departure for the Law Court's discussion of reasonable anticipation was Calder v. Jones, 465 U.S. 783 (1984), the progenitor of a special line of defamation jurisdiction cases, where defamatory speech that is focused on the plaintiff's in-forum activity, that is published in-forum (and elsewhere), and that is designed to, and does, cause reputational injury in-forum, will support an exercise of jurisdiction over an out-of-forum defendant.  Id. at 788-90.  This is a different line of authority from a "product in the stream of commerce" case.  Nevertheless, Bickford demonstrates the most extensive reach that the

12

Law Court has yet given to its reasonable anticipation standard, more extensive than the Court's earlier jurisdictional opinion in Murphy v. Keenan might have suggested.

In Murphy, a Maine resident (Murphy) traveled to New Hampshire to purchase a boat from the defendant dealer. Murphy purchased the boat and accepted delivery in New Hampshire. The bill of sale stated that the seller warranted good title and that the boat was free of liens, but following Murphy's return to Maine with the boat, he discovered that a lien existed and was forced to pay off the lien holder to his damage. 667 A.2d at 592-93. The Law Court decided that the Maine Superior Court properly declined to exercise jurisdiction over the out-of-state dealer, reasoning that the suit was based exclusively on Murphy's citizenship and not any forum contacts by the dealer. The Law Court rejected the idea that the existence of a warranty provision in a sales contract could independently ground jurisdiction, finding: "A continuing contractual obligation necessary to support the exercise of jurisdiction requires ongoing contact between the parties with the expectation of conducting future business. A warranty is not of the same nature as continuing contacts for business purposes and does not establish a continuing contractual obligation." Id. at 595 (citations omitted).[4] The Law Court also rejected the idea that jurisdiction might exist simply because the dealer could have foreseen that the boat would enter Maine. Id. (citing World-Wide Volkswagen, 444 U.S. at 295). There is no indication in the opinion that Murphy contacted the dealer to provide notice of the title

---

[4] The Law Court's opinion does not include the text of the warranty provision. It appears from the opinion, however, that the warranty related to title rather than product fitness. Nor does the opinion discuss the possible distinction between a dealer's warranty and a manufacturer's warranty. Here, Chesapeake has issued a warranty over its own product, knowing the product was custom-built for, and destined for, a customer in Maine for use in Maine.

13

issue and to request a cure, prior to litigation, unlike the facts reflected in Bickford and in this case.

Neither Bickford nor Murphy is squarely on point when it comes to applying the Law Court's reasonable anticipation framework to a case involving sale of a product to a Maine resident where the product is nationally advertised and the seller has negotiated and arranged for the sale using wire communications directed into Maine to the Maine-based buyer, knowing its product would be used in Maine. Bickford is not on point because it was not a stream of commerce case. Murphy is not on point because it was a point-of-sale transaction, where there was "nothing in the record to indicate any effort . . . to attract or serve a market in Maine." Id. When Judge Hornby decided Maine Helicopters, he was concerned that Murphy might weigh against an exercise of jurisdiction because the Law Court stated there that "[i]ssuing a warranty in connection with the New Hampshire sale of a boat to a known Maine resident does not . . . meet[] the [reasonable anticipation] requirement." 563 F. Supp. 2d at 296. Judge Hornby ultimately distinguished Murphy on the basis of (1) the defendant's placement of an advertisement in a national publication; (2) the defendant's pursuit of the sale through interstate communications directed into Maine; (3) the defendant's knowledge that the helicopter was destined for use in Maine; (4) a post-sale course of communication designed "to prevent discovery of the helicopter's true condition"; and (5) the defendant's refusal to correct engine problems to resolve the harm being felt in Maine. Id. at 297. With these additional factors, Judge Hornby concluded that the case involved "as much in the way of contacts as [Bickford, and] more than the mere warranty of [Murphy]," thereby resolving the concern that a Maine court might not exercise jurisdiction even if federal precedent

did not stand in the way.  Id.  I conclude that this case is sufficiently similar to Maine Helicopters to pass the Law Court's reasonable anticipation test.

Having addressed Law Court precedent, Judge Hornby next considered whether federal court precedent concerning the purposeful availment standard would require a different result, noting that the case was difficult on that question as well.  Id.  He decided that Maine Helicopters met the federal burden as well, based on just the pre-sale, nation-wide advertisement, sale-related communications directed into Maine, and sale of the helicopter to a Maine-based entity, without consideration of post-sale communications. Id. at 297-98 & n.7.  Those factors are all equally present in this case.  The record here reflects a confluence of national advertising activity, pre- and post-sale interstate communications directed into Maine, knowledge that the vessel was destined for use in Maine, and a contract and sale with a Maine-based company.  In addition, the claims in this case also relate to Chesapeake's voluntary extension of a lifetime product warranty.

When it comes to purposeful availment, the Court must endeavor to take "a 'highly realistic' approach" that focuses not on any "mechanical" test but on the significance of the parties' "prior negotiations and contemplated future consequences, along with the terms of the contact and the parties' actual course of dealing."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985).  Moreover, the relatedness requirement is not a stringent one.  To the contrary, it reflects "added flexibility and signals a relaxation of the applicable standard."  Ticketmaster-New York v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).  Thus, even if Lulu's claims do not neatly arise out of Chesapeake's Maine contacts, as compared to Chesapeake's Maryland boat-building activity, there is a causal relation between Chesapeake's voluntary contacts with its Maine

15

customer, its provision of a custom-made boat for use in Maine, and the resulting claims in contract, equity and tort. With respect to all of the material realities of the instant dispute, they are for all practical purposes equivalent to those of the Florida defendant in Maine Helicopters. To paraphrase:

> [Chesapeake's] contacts with Maine were entirely voluntary, not random or fortuitous or those of a third party. And after [Lulu's] initial inquiry, [Chesapeake] knew that it was soliciting a purchase from a Maine-based corporation that planned to use the [vessel] in Maine. Nevertheless, [Chesapeake] continued the process with several phone and fax transmissions into Maine.

Maine Helicopters, 563 F. Supp. 2d at 298. Although Chesapeake's method of structuring the deal for delivery in Maryland makes for a close case, the foregoing factors, plus Mason's promise to build the vessel to Lulu's specifications and its extension of a lifetime warranty over a product it knew was destined for Maine, are together sufficient to meet the federal requirements of relatedness and purposeful availment. Given the nature of this transaction and the relationship that arose from it, it does not offend due process if a court located in Maine exercises jurisdiction over an out-of-state defendant who knowingly and voluntarily directed its products at a Maine consumer and the controversy at issue arises from or relates to that transaction. Id.; cf. Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 111-13 (1987) (plurality op.) (flagging intent to serve the market in the forum state and distinguishing purposeful direction of product toward forum state from mere foreseeability that a product might enter forum state through independent channels). If this exposure is not acceptable to Chesapeake, then it "can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great,

severing its connection with the State." Asahi Metal, 480 U.S. at 110.[5] It might also consider using an exclusive forum selection clause.

### 3. Fair Play and Substantial Justice

The final stage of the jurisdictional analysis requires the Court to consider whether the exercise of jurisdiction over Chesapeake would comport with traditional notions of fair play and substantial justice. This analysis, whether viewed through the lens of Law Court precedent or federal precedent, comes out the same, although the state law formulation places the burden on the defendant to prove a lack of fairness. Bickford, 2004 ME 111, ¶ 10, 855 A.2d at 1155. The factors are:

> the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies.

N. Laminate Sales, 403 F.3d at 25. Also relevant to this inquiry, for purposes of Maine law, are the nature and purpose of Chesapeake's forum contacts and their connection to the cause of action, Commerce Bank & Trust Co. v. Dworman, 2004 ME 142, ¶ 18, 861 A.2d 662, 667, though I have already addressed these with regard to the reasonable anticipation, relatedness, and purposeful availment standards. This case is equivalent to Maine Helicopters on all of these questions. See 563 F. Supp. 2d at 297, 298. The judicial systems in either forum might efficiently resolve the parties' controversy, though,

---

[5] The closeness of the jurisdictional controversy is reflected by the recent case of Byrne v. Brunswick Corporation, No. 07-cv-43-JD, 2007 U.S. Dist. Lexis 4690 (D. N.H. June 26, 2007) (not for publication). There, the District of New Hampshire refused to exercise jurisdiction over an Ohio provider of mechanical services that installed a third-party, aftermarket product in the plaintiff's boat. Unlike the defendant there, Chesapeake has produced its own product and has advertised its boats and boat-building services regionally. For example, the plaintiff in Byrne located the defendant only because the defendant was identified as an authorized dealer of the after-market product in question, not as a result of the defendant's own efforts to serve the New Hampshire market. Id. at *3.

17

arguably, interstate social policy is better served by litigation in Maryland, because Maryland is in a better position to regulate Chesapeake's ongoing commercial operations, whereas litigation in Maine serves only one resident's legal claims. There is an appreciable burden on Chesapeake to appear in Maine, though that burden does not appear to be any greater than the one that would befall Lulu if forced to litigate its claims in Maryland.[6] Conversely, forcing either party to travel would not be fundamentally unfair. Lulu went shopping for a custom boat in Maryland and Chesapeake was perfectly willing to custom build a boat for a Maine-based commercial enterprise and to extend a limited lifetime warranty over its product. Ultimately, there is nothing so weighty among these factors as would compel a different outcome than what I have recommended with respect to reasonable anticipation, relatedness, and purposeful availment.

**B.     Change of Venue**

Chesapeake requests, as an alternative to dismissal, that the Court transfer Lulu's action to the District of Maryland for future proceedings. (Mot. at 18-19.) Pursuant to 28 U.S.C. § 1404(a): "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). Transfer

---

[6]     Chesapeake would have the Court determine the fundamental fairness issue in its favor based on Mr. Mason's health. (Mot. at 12.) Chesapeake does not cite any precedent in which a litigant's personal health issues were relied upon as the decisive factor in a due process analysis. I address the health issue as a venue concern.

is not out of the question in this case because the District of Maryland is a district in which Lulu might have filed its action.

According to Chesapeake, a transfer of venue would be just in this case because of the presence of documents and witnesses in Maryland related to the construction of the vessel.  Chesapeake also says that this litigation will have a serious economic impact on its operations if it comes to trial in Maine.  (Mot. at 18.)  It says that all of its employees are potential witnesses and a trial in this matter would unduly disrupt its business.  (Id. at 19.)  Chesapeake also complains that Mr. Mason's health and anxiety over flying make it more appropriate to relocate the litigation to Maryland.  (Id.)  Against this showing, Lulu asserts that it is a small operation, too, and must have its employees available in Maine in order to maintain its operations.  (Opposition Mem. at 17.)  It states that Mr. Nicolai is essential to its operations as he is the captain of the vessel and must be available for the business to operate.  (Id.)  Lulu questions the notion that every Chesapeake employee would be a witness at trial and that the boat building operation would shut down during a trial, assuming trial is scheduled while boat orders are outstanding.  (Id.)  Lulu also states that it must build its case through reliance on third-party witnesses, rather than employees, and that it would be disadvantaged by the difficulty and expense of getting such witnesses to trial in Maryland.  (Id. at 18.)  Lulu argues that it has documentary evidence in Maine, but also that the movement of documents from one forum to the other would not be an appreciable burden for either party.  (Id. at 19.)  Finally, Lulu notes that this docket is less congested and will presumably yield a more efficient resolution.  (Id.)

Based on the parties' evidence of relative burden and convenience, I am not persuaded that transfer of the case at this time would result in a more balanced over-all

19

playing field. Conceivably, after the case has matured through discovery and dispositive motions, the overall circumstances in existence on the eve of trial might warrant a transfer for purposes of trial, depending, for example, on Mr. Mason's health, the volume of work that Chesapeake has, and whether or not Lulu's seasonal business is still underway. In my view, the circumstances are too uncertain at this juncture to tip the balance appreciably in favor of transfer.

## CONCLUSION

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court DENY both the motion to dismiss (Doc. 6) and the motion to change venue (Doc. 7).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 21, 2009